**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kelli Salazar, et al., | No. CV-19-05760-PHX-SMB |
| Plaintiffs, | **ORDER** |
| v. | |
| Driver Provider Phoenix LLC, et al., | |
| Defendants. | |

Pending before the Court is Plaintiffs' Motion to Enjoin or Limit Application of Defendants' New Arbitration Agreement, Approve Curative Notice, and Limit Defendants' Communications with Putative Class Members and Request for Expedited Ruling. (Doc. 73.) Defendants responded, (Doc. 78), and Plaintiffs replied. (Doc. 79.) The Court held oral argument on the Motion on March 23, 2021. The Court has considered the pleadings and the relevant authority and the motion is granted in part and denied in part for the reasons discussed below.

## I.    BACKGROUND

Plaintiffs, chauffeur drivers who worked for The Driver Provider in Arizona, Utah, and Wyoming, filed this lawsuit against Defendants on behalf of themselves and all similarly situated employees for Defendants' alleged failure to compensate employee drivers with minimum wage and overtime wages and the failure to maintain payroll records for the Plaintiffs. (Doc. 45 ¶¶ 7-9.) Defendants are privately owned chauffeur companies in Arizona, Utah, and Wyoming and their owners and officers. Plaintiffs' Third Amended

1   Complaint brings three causes of action: (1) failure to pay overtime in violation of the Fair

2   Labor Standards Act ("FLSA"), (2)  violation of Arizona's Wage Act, A.R.S. §§ 23-350,

3   *et seq.*, and (3) violation of the Arizona Minimum Wage Act, A.R.S. §§ 23-362, *et seq*.

4   (Doc. 45.)

5          Plaintiffs recently learned that Defendants emailed employees and required them to

6   sign arbitration agreements as a condition of continued employment. (Doc. 73 at 1.) On or

7   about December 17, 2021, Jennifer Norton, Defendants' "Financial Controller," emailed

8   "'active Chauffeurs" through DocuSign stating that The Driver Provider was "update[ing]

9   its personnel files electronically." (Doc. 73 ¶¶ 4-5; Doc. 78 at 3.) The email told employees

10  to "review the attached documents and sign via Docusign at your earliest convenience and

11  no later than Monday, December 21st, 2020. (Doc. 73 ¶ 5.) The email directed employees

12  to reach out to Barry Gross if they had questions." (*Id.*) Attached to the email was a 15-

13  page pdf packet. (*Id.* ¶ 6.) At the end of the packet was an arbitration agreement titled,

14  "Employment Dispute Resolution Agreement" ("Agreement"). (*Id.* ¶ 7.) Defendants never

15  advised employees of the existence of this lawsuit or gave them an opportunity to opt-out

16  of the Agreement. (*Id.* ¶¶ 8-9.) The Agreement itself states, "Your execution of this

17  Agreement is a condition of your employment or continued employment with the Company

18  and the benefits and compensation that you receive as an employee constitutes

19  consideration for your acceptance of this Agreement." (Doc. 74.) The "Covered Claims"

20  section of the Agreement states that it covers "all disputes relating to or arising out of [the

21  Driver's] employment with the Company or the termination of that employment." (*Id.*) The

22  "Class and Collective Action Waiver" portion of the Agreement expressly prohibits

23  arbitrations on a class basis. (*Id.*) At the end of the Agreement, it states in all caps, "This

24  Agreement constitutes a waiver of the parties' right to a jury trial and the right to bring or

25  participate in any class or collective action as to Covered Claims." (*Id.*)

26          Plaintiffs filed this Motion to move the Court for an order "(1) enjoining application

27  of Defendants' new 'Employment Dispute Resolution Agreement' to the claims of any

28  current or putative Class Members in this case; (2) approving and authorizing curative

1   notice to putative Class Members; and (3) limiting Defendants' *ex parte* communications

2   with putative Class Members." (Doc. 73 at 1.)

3   **II.   LEGAL STANDARD**

4           The same principles that govern communications with putative class members in

5   class actions under Rule 23 apply to communications with potential opt-in plaintiffs in a

6   collective action brought under the FLSA. *OConner v. Agilant Sols, Inc.*, 444 F. Supp. 3d

7   593, 600 (S.D.N.Y. 2020); *see also Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165,

8   171 (1989) (holding that the same justification for exercising control over class

9   communications under Rule 23 apply in collective actions). "Rule 23(d) provides that the

10  court may issue orders that 'require—to protect members and fairly conduct the action–

11  giving appropriate notice to some or all class members of ... any step in the action," 'impose

12  conditions on the representative parties,' or 'deal with similar procedural matters.'" *Doe 1*

13  *v. Swift Transportation Co.*, No. 2:10-CV-00899 JWS, 2017 WL 735376, at *2 (D. Ariz.

14  Feb. 24, 2017) (citing Fed. R. Civ. P. 23(d)). "Because of the potential for abuse, a district

15  court has both the duty and the broad authority to exercise control over a class action and

16  to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil Co. v.*

17  *Bernard*, 452 U.S. 89, 100 (1981). Courts have "discretionary authority to oversee the

18  notice-giving process" in an FLSA collective action. *Hoffman-La Roche Inc.*, 493 U.S. at

19  174. "Because formal notice to potential plaintiffs is sent only after conditional

20  certification, pre-certification, *ex parte* communication with putative FLSA collective

21  action members about the case has an inherent risk of prejudice and opportunities for

22  impropriety." *OConner*, 444 F. Supp. 3d at 601 (internal quotation marks and citations

23  omitted). "[A]n order limiting communications between parties and potential class

24  members should be based on a clear record and specific findings that reflect a weighing of

25  the need for a limitation and the potential interference with the rights of the parties." *Gulf*

26  *Oil*, 452 U.S. at 101.

27  **III.   ANALYSIS**

28          Plaintiffs' Motion first asks this Court to find that the Agreement does not apply to

the claims of this case. (Doc. 73 at 8.) Defendants counter by arguing that a finding on the enforceability of the Agreement is premature and that Plaintiffs lack standing. (Doc. 78 at 5.) Specifically, Defendants claim that they have not yet decided whether they will seek to enforce the Agreement as it relates to the claims in this case. (*Id.*) Defendants claim that even if it were ripe, the communications made to employees were not misleading or coercive. (Doc. 78 at 6.)

### A. Standing

Defendants first argue that the Court should deny Plaintiffs' motion because Plaintiffs lack standing because they cannot demonstrate an injury-in-fact before Defendants attempt to enforce the Agreement. (Doc. 78 at 5 citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).) Defendants "have not yet decided whether they will seek to enforce" the Agreement as it relates to this case. (*Id.*) Plaintiffs argue that they have already realized an injury: "Drivers will believe they are prohibited from participating in this case when, in fact, they are not." (Doc. 79 at 1.) Plaintiffs, in other words, argue that the Agreement will have a chilling effect on potential collective action members' participation in this case. The Court agrees with Plaintiffs. Plaintiffs have already suffered in injury in the form of deterring potential collective action members from opting into the action. After signing the Agreement, potential collective action members are likely to assume that their participation in this case is prohibited. Thus, Plaintiffs have standing and need not wait until Defendants decide whether to enforce the Agreement to bring this Motion.

### B. The Agreement's Application to the Claims in this Case

"Courts routinely exercise their discretion to invalidate or refuse to enforce arbitration agreements implemented while a putative class action is pending if the agreement might interfere with members' rights." *Jimenez v. Menzies Aviation Inc*, No. 15-CV-02392-WHO, 2015 WL 4914727, at *6 (N.D. Cal. Aug. 17, 2015). Indeed, Plaintiffs cite a litany of cases where district courts have found arbitration agreements improper or unenforceable when sent to potential class members before certification. *See, e.g., Jimenez,*

2015 WL 4914727, at *6; *OConner*, 444 F. Supp. 3d at 603 (holding arbitration agreement "cannot be enforced to preclude putative plaintiffs from participating in [the] lawsuit."); *O'Connor v. Uber Techs., Inc.*, C-13-3826 EMC, 2013 WL 6407583, at *7 (N.D. Cal. Dec. 6, 2013) (requiring Uber to seek approval again for drivers who had signed an arbitration agreement and giving them 30 days to accept or opt out of the agreement).

Defendants counter that Plaintiffs have failed to show that The Driver Provider obtained consent to the Agreements as a result of coercive, misleading, or other improper communications with potential collective action members. (Doc. 78 at 6.) Defendants urge the Court to consider the factors used in *Chen-Oster v. Goldman Sachs & Co.*, 449 F. Supp. 3d 216, 253 (S.D.N.Y. 2020), and find that their communication with employees was not misleading under the totality of the circumstances. The factors in *Chen-Oster* are:

> (1) the relative vulnerability of the putative class members; (2) evidence of actual coercion or conditions conducive to coercion; (3) whether the defendant targeted putative class members in a purposeful effort to narrow the class; (4) whether the arbitration provision was unilaterally imposed on the putative class; and (5) evidence of misleading conduct, language, or omissions, including the extent to which the agreement does or does not mention the existence of the putative class action and related information.

*Id.* at 255.[1] While the Court recognizes that the *Chen-Oster* case is not controlling, it nonetheless finds the factors cited in the case instructive. Examining the *Chen-Oster* factors, the Court finds that The Driver Provider's communication regarding the Agreement and portions of the Agreement itself are coercive and misleading as it relates to this case.

First, the putative class members are particularly vulnerable. In stark contrast to *Chen-Oster* where the class was made up of sophisticated financial services professionals, the potential collective action members in this case are low-wage workers, most of whom were furloughed as a result of the COVID-19 pandemic. *Id.* at 264. Therefore, potential

---

[1] Plaintiffs correctly point out that the factors in *Chen-Oster* are not controlling, but nonetheless argue that an analysis of the factors "leaves no doubt that remedial relief is appropriate." (Doc. 79 at 3.)

collective action members are vulnerable in this case.

Second, there are conditions conducive to coercion present here. As in *OConner v. Agilant Sols., Inc.*, The Driver Provider directed employees to sign and return the Agreement within two business days. 444 F. Supp. 3d at 603; (Doc. 74). Additionally, the Agreement itself states that the drivers' execution of the Agreement was a condition of their employment and continued employment with The Driver Provider. (Doc. 74.) Both facts support a finding that the communication and Agreement were coercive. *Cf. Chen-Oster*, 449 F. Supp. 3d at 265-66 (finding no coercion where plaintiffs only pointed to the employer-employee relationship as a coercive factor).

Examining the third factor, it is unclear whether Defendants targeted the putative class members. Plaintiffs provided no evidence to show that Defendants meant to target putative class member with the Agreement, and Defendants are silent on the issue. The only inference the Court could draw against Defendants on this factor is the timing of the Agreement.[2] Accordingly, it is unclear whether Defendants meant to target potential collective action members or if they simply required the execution of the Agreement to prevent future disputes, and Plaintiffs did not affirmatively prove this factor.

Fourth, Defendants unilaterally imposed the Agreement on drivers. Unlike in *Chen-Oster* where part of agreements offered to, and individually accepted by, employees provided them "valuable promotions, compensation, and severance arrangements," here, employees got nothing in return for their execution of the Agreement besides the pleasure of remaining employed.[3] Therefore, this case compares to other cases discussed by *Chen-Oster* where employees only received continued employment for their acceptance of such agreements. *See, e.g., Billingsley v. Citi Trends, Inc.*, 560 F. App'x 914, 918-19 (11th Cir. 2014) (store managers were presented the arbitration agreement and informed that their

---

[2] Defendants distributed the communication and Agreement to current drivers while Plaintiffs' Motion for Conditional Certification was still pending.

[3] As the Plaintiffs note, some employees likely did not even receive continued employment as a result of the COVID-19 furloughs. Ms. Sanderson has not worked for Defendants since October 2020. (Doc. 79 at 5, n. 3.) Therefore, it is hard to say that the drivers here even received continued employment as consideration for their execution of the Agreement.

agreement was a condition of continued employment); *see also Jimenez*, 2015 WL 4914727, at *6 ("Menzies provided no opportunity to opt-out of its new policy, making assent to the ADR Policy a condition of employment.").[4] Accordingly, the facts weigh in favor of a finding that Defendants unilaterally imposed the Agreement on employees.

Fifth, the communication and Agreement were misleading and contained a complete omission of the existence of this action. The Court in *Chen-Oster* noted that "Courts are indeed more likely to take remedial action when the defendant presenting an arbitration agreement or release does not call attention or provide sufficient information about the class or collective action." 449 F. Supp. 3d at 268 (citations omitted). The Court finds *OConner* and *Jimenez* instructive for this factor, as they are particularly analogous to this case. In *OConner*, another FLSA collective action, the company sent an arbitration agreement to employees after plaintiffs had commenced the action, but the company did not explain to employees that they would forfeit their right to participate in the pending litigation by signing the arbitration agreement. *OConner*, 444 F. Supp. 3d at 599. The court highlighted the fact that the company made no attempt to give employees notice that they would lose their ability to participate in the lawsuit by signing the agreement and thus found that the defendant's communications with putative plaintiffs were "improper and misleading." *Id.* at 603. Similarly, in *Jimenez*, the defendant company rolled out a new ADR policy requiring employees to arbitrate their claims after the plaintiff had filed a complaint with the district court. *Jimenez*, 2015 WL 4914727, at *1-2. Plaintiffs were putative class members at the time they signed the policy. *Id.* at *3. The court explained that the ADR policy was unenforceable because the company did not inform putative class

---

[4] At oral argument, counsel for Defendants argued that execution of the Agreement was not coercive because the company did not fire employees who did not sign the Agreement. As support for this, counsel cited at least one instance where The Driver Provider allowed an employee to remain employed despite the employee's refusal to execute the Agreement. The Court is unpersuaded by this argument. Simply because The Driver Provider did not act upon its threat does not negate the fact that the condition was present in the Agreement. And many employees likely executed the Agreement in response to the condition ignorant of the fact that the company would not actually have fired them if they refused to execute it.

1     members of the pending litigation, did not explain the consequences of agreeing to the

2     policy, and did not provide an opt-out procedure. *Id.* at 5. Here, as in *OConner and Jimenez*,

3     Defendants did not inform employees of this pending litigation or explain what effect

4     signing the agreement could have on litigation.

5          Additionally, language of the Agreement itself is misleading if the Agreement were

6     applied to the claims in this case.  The Agreement states The Driver Provider "hopes we

7     never have a dispute relating to your employment here." (Doc. 74.) This language implies

8     that the Agreement will cover employment disputes that arise in the future. Further down,

9     the Agreement states that it covers disputes that "*may arise* between you and the

10    Company…" (*Id.* (emphasis added).) This language also implies that the Agreement will

11    apply only to claims that may arise in the future. *See Castro v. ABM Indus., Inc.*, No. 17-

12    CV-3026-YGR, 2018 WL 2197527, at *4 (N.D. Cal. May 14, 2018) ("Courts have found

13    that the choice of the word 'arise' suggests that the clauses govern present or future

14    conduct, not past conduct."). Therefore, the language of the Agreement would be

15    misleading if used to bar potential collective action members from joining this action.

16         Under the totality of the circumstances, the Court finds that Defendants'

17    communication and Agreement with employees was coercive and misleading if Defendants

18    attempted to use the Agreement to bar employees from participating in this collective

19    action. The Court's holding is narrow. The Court rules only that the Agreement is not

20    enforceable against the putative Plaintiffs for this action only. The Court does not rule that

21    Defendants are precluded from enforcing the agreement for other claims or future cases.

22    **C. Corrective Notice**

23         Plaintiffs argue that the Court should issue a curative notice to potential collective

24    action members is appropriate considering the Agreement and its potential to mislead class

25    members. (Doc. 73 at 15-16.) The Court agrees that a corrective notice is appropriate. Other

26    courts have issued a corrective notice under similar circumstances. *Swift Transportation*,

27    2017 WL 735376, at *6 (the court agreed to issue a corrective notice to prevent a potential

28    chilling effect on putative class members); *Slavkov v. Fast Water Heater Partners I, LP*,

No. 14-CV-04324-JST, 2015 WL 6674575, at *6-*7 (N.D. Cal. Nov. 2, 2015) (ordering the parties to submit competing proposed curative notices when it found defendant's communications with class members were misleading); *OConner*, 444 F. Supp. 3d at 607 (holding a telephonic conference to discuss corrective notice after the court determining that the arbitration agreement at issue was not enforceable against putative plaintiffs). A corrective notice is appropriate to cure any chilling affect the Agreement may have on potential collective action members who may falsely believe that the Agreement bars them from participating in this action. The Court is in receipt of Plaintiffs' proposed curative notice. (Doc. 73-1.) The Defendants are ordered to submit a proposed curative notice or a notice of no objection to Plaintiffs' proposed curative notice to the Court within seven days of the date of this order.

**D. Communication between Defendants and Potential Collective Action Members**

Plaintiffs urge the Court to limit communications between Defendants and potential collective action members. Plaintiffs ask the Court to "prohibit Defendants from making unilateral, *ex parte* communications" with class members and putative class members regarding this case and issues directly related to it. (Doc. 73 at 17.) "The Court has authority to regulate communications which jeopardize the fairness of the litigation even if those communications are made to future and potential putative class members." *Uber Techs.*, 2014 WL 1760314, at *4. The Court declines to limit communications between Defendants and potential class members at this time. However, it will not hesitate to do so if Defendants engage in conduct or communications with putative class members that threaten the fairness of this litigation.

**IV.    CONCLUSION**

For the reasons discussed above,

**IT IS ORDERED** granting in part and denying in part Plaintiffs' Motion to Enjoin or Limit Application of Defendants' New Arbitration Agreement, Approve Currative Notice, and Limit Defendants' Communications with Putative Class Members and Request for Expedited Ruling. (Doc. 73.) The motion is granted in that the Court orders that

Defendants' arbitration agreement cannot be enforced against putative collection action members for the purposes of this litigation. The motion is also granted as to Plaintiffs' request for a curative notice as described above. The motion is denied as to Plaintiffs' request that the Court limit Defendants' communications with putative collection action members.

**IT IS FURTHER ORDERED** that Defendants submit their proposed corrective notice or notice of no objection to Plaintiffs' corrective notice to the Court within seven days as explained above.

Dated this 5th day of April, 2021.

Honorable Susan M. Brnovich
United States District Judge