**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kelli Salazar, et al., | No. CV-19-05760-PHX-SMB |
| Plaintiffs, | **ORDER** |
| v. | |
| Driver Provider Phoenix LLC, et al., | |
| Defendants. | |

Before the Court is Defendants' Motion for Decertification of the FLSA Collective. (Doc. 381.) Plaintiffs Kelli Salazar, Wayne Carpenter, Rodney Lopez, and Gregory Hanna, individually and on behalf of other similarly situated individuals (collectively "Plaintiffs"), filed a Response in Opposition (Doc. 443), and Defendants filed a Reply (Doc. 451.) The Court exercises its discretion to resolve this motion without oral argument. *See* LRCiv 7.2(f) ("The Court may decide motions without oral argument."). After reviewing the parties' arguments, the Court will grant Defendants' Motion for the reasons discussed below.

**I.    BACKGROUND**

Plaintiffs filed their Complaint on December 6, 2019 (Doc. 1) and moved for conditional certification of the Fair Labor Standards Act ("FLSA") collective on July 30, 2020 (Doc. 38). On March 23, 2021, the Court granted Plaintiffs' Motion for Conditional Certification and approved a form of notice on April 13, 2021. (Docs. 96, 99.) The FLSA collective consists of: "All current and former employees of The Driver Provider who

performed chauffeur services at any time during the three (3) years prior to the commencement of this lawsuit." (Doc. 38 at 3.) As of November 23, 2022, Defendants assert there are eighty opt-in plaintiffs in addition to the four Named Plaintiffs. (Doc. 381 at 3.)

The Driver Provider conducts its business in numerous locations including Phoenix, Arizona; Tucson, Arizona; Sedona, Arizona; Jackson Hole, Wyoming; Salt Lake City, Utah; and Park City, Utah. Offering chauffeured services, it operates a fleet of buses, vans, sport utility vehicles and sedans. Defendants move to decertify the conditional FLSA collective arguing Plaintiffs had different job duties, were paid differently, and were subject to different employment polices—making collective treatment "not only infeasible, but virtually impossible." (*Id.* at 2.) Furthermore, Defendants argue that Drivers are exempt under the 29 U.S.C. § 207(i) exemption and the taxicab exemption.[1] They contend these exemptions differ between Drivers based on job duties, location, vehicle, and the nature of the Drivers' assignment that week. Therefore, Defendants argue Plaintiffs are not similarly situated regarding exemption status, and that resolution of Plaintiffs' clams would require an individual summary judgment analysis or mini-trials for each Plaintiff. Plaintiffs object and argue Plaintiffs are similarly situated and that each exemption can be decided on a collective basis.

## II. LEGAL STANDARD

Under the FLSA, Plaintiffs may sue their employers on behalf of themselves and "similarly situated" employees. 29 U.S.C. § 216(b). Courts follow a two-step approach to determining whether employees are similarly situated. *See Campbell v. City of Los Angeles*, 903 F.3d 1090, 1109–10 (9th Cir. 2018). The Ninth Circuit identified this two-step approach to collective action certifications based on a "loose consensus" of other lower courts where "(1) the plaintiff may, around the pleadings stage, seek 'preliminary certification' and (2) the employer may, at or after the close of discovery, file a motion for

---

[1] Defendants' Motion also argues decertification under the Motor Carrier exemption, but the Court has since denied Defendants' leave to amend their Fourth Amended Complaint to assert this defense. (*See* Doc. 408.) The Court will therefore not address this argument.

'decertification.'" *Guanzon v. Vixxo Corp.*, No. CV-17-01157-PHX-DWL, 2019 WL 1586873, at *2 (D. Ariz. Apr. 12, 2019) (citing *Campbell*, 903 F.3d at 1108–10). The Ninth Circuit explained, "as a general rule, the two-step process, culminating in a decertification motion on or after the close of relevant discovery, has the advantage of ensuring early notice of plausible collective actions, then eliminating those whose promise is not borne out by the record." *Campbell*, 903 F.3d at 1110.

At the beginning of the two-step process, a court will typically conditionally certify a collective action if presented with "substantial allegations that the putative class members were together the victims of a single decision, policy, or plan." *Colson v. Avnet, Inc.*, 687 F. Supp. 2d 914, 925 (D. Ariz. 2010) (citations omitted). This is a low burden, and if plaintiff meets it, all potential members of the collective action are notified with an opportunity to opt-into the lawsuit. *Id.*

Second, after notification and discovery a defendant may move to decertify the class, leaving courts to revisit if class members are similarly situated. *Id.* The Ninth Circuit has clarified the decertification standard for courts in this second stage. *See Campbell*, 903 F.3d at 1117. The ad hoc majority approach used by most courts was rejected, and the Ninth Circuit held that collective treatment is appropriate only "to the extent party plaintiffs are alike in ways that matter to the disposition of their FLSA claims." *Id.* at 1114. Furthermore, what matters "is not just *any* similarity between party plaintiffs, but a legal or factual similarity material to the resolution of the party plaintiffs' claims, in the sense of having the potential to advance these claims, collectively, to some resolution." *Id.* at 1115. Moreover, "decertification of a collective action of otherwise similarly situated plaintiffs cannot be permitted unless the collective mechanism is truly infeasible." *Id.* at 1116.

In a post-discovery motion for decertification, and when "decertification overlaps with the merits of the underlying FLSA claims, the summary judgment standard is the appropriate one." *Id.* at 1117.

> The standard is therefore a mid- or post-trial analogue to the test applied at summary judgment, which asks, pretrial, whether sufficient evidence exists to preclude a judgment as a matter of law because, viewing the competent

> evidence in the light most favorable to the nonmoving party, the trier of fact could properly find for the nonmoving party.

*Id.* at 1118. District courts "may not, on a merits-dependent decertification motion, weigh evidence going to the merits. If collective treatment is premised on a genuine dispute of material fact as to the meris of the party plaintiffs' FLSA claims, the collective action cannot be decertified unless the factual dispute is resolved against the plaintiffs' assertions by the appropriate factfinder." *Id.* at 1119. Lastly, a plaintiff bears the burden of demonstrating collective treatment is appropriate. *See Guanzon*, 2019 WL 1586873, at *5 (citing *Campbell*, 903 F.3d at 1117–18).

### III. DISCUSSION

Defendants argue that collective treatment is infeasible under both asserted exemptions. Defendants note that upon moving for conditional certification, Plaintiffs argued all Drivers were similarly situated because they

> all had the same job duties, were or are subject to the same policies and procedures relevant to Plaintiffs' claims, were or are all subject to the same compensation structure and are alleged to have been denied applicable minimum and/or overtime wages to which they are statutorily entitled as a result of Defendants' common practices and policies.

(*See* Doc. 38 at 7.) But after discovery Defendants assert: "Plaintiffs had different job duties and were paid differently based on Driver qualifications, vehicles driven, and routes driven." (Doc. 381 at 7.) For this reason, Defendants argue decertification is necessary because the Court will need to individually analyze whether Drivers are exempt under the § 7(i) exemption and the taxicab exemption. Plaintiffs counter that all Drivers were considered "chauffeurs" by The Driver Provider, performed the same job duties, and were subject to the same policies and procedures.

### A. Section 7(i) Exemption

Defendants argue individual analyses are required to determine whether Drivers fall under the § 7(i) exemption. Section 7(i) provides that:

> No employer shall be deemed to have violated [the overtime provisions] by employing any employee of a retail or service establishment for a workweek in excess of the applicable workweek specified therein, if (1) the regular rate of pay of such employee is in excess of one and one-half times the minimum

- 4 -

>hourly rate applicable to him under the [minimum wage section] of this title, and (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services.

29 U.S.C. § 207(i). In other words, for the exemption to apply to a Driver, Defendants must prove that (1) each business location is a retail or service establishment; (2) each Driver's regular rate of pay was more than 1.5 times the minimum wage; and (3) more than half of each Driver's compensation represented commissions on the sale of goods or services. *Gieg v. DDR, Inc.*, 407 F.3d 1038, 1046 (9th Cir. 2005) (citing 29 U.S.C. § 207(i)). Plaintiffs maintain no Driver qualifies under this exemption, and Defendants maintain that every Driver qualifies. For this reason, Plaintiffs argue all Drivers are similarly situated because they all need to ascertain whether they fall under the § 7(i) exemption, and therefore should be decided on a collective basis. But Defendants counter that because different factors exist for each Driver, an individual analysis is required to determine each Driver's exemption status. The Court will analyze each factor in turn.

        1.      <u>Whether The Driver Provider is a "retail or service establishment"</u>

Under the first factor, Defendants argue the Driver Provider operates a "retail or services establishment" within the meaning of § 7(i). *See* 29 C.F.R. § 779.312 *et seq.*; *see also Gieg*, 407 F.3d at 1046. However, Defendants first argue the Department of Labors' ("DOL") definition of "retail or service establishment" is invalid because it derives its definition from 29 U.S.C. § 213(a)(2), which was repealed by Congress. Under the DOL regulations, "retail or service establishment" qualifications are as follows: (1) the business must "engage in the making of sales of goods or services"; (2) "75 percent of its sales of goods or services, or of both, must be recognized as retail"; and (3) "not over 25 percent of its sales of goods or services, or of both, may be sales for resale." 29 C.F.R. § 779.313.

Defendants also point to the Seventh Circuit's critique of the DOL regulations' definitions in relation to the FLSA, in which they find:

>[The DOL regulations] attempt to define a 'retail or service establishment' by listing factors of dubious relevance, such as that '75 per centum of [its] annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry,' 29

> C.F.R. § 779.312, or that the establishment 'serves the everyday needs of the community in which it is located.' 29 C.F.R. § 779.318. We don't see the connection between these criteria and the reasons for excusing certain employers from the overtime provisions of the Fair Labor Standards Act. . . . The Department's definition comes from section 213(a)(2), which as we've noted was the intrastate business exemption.

*Alvarado v. Corp. Cleaning Servs., Inc.*, 782 F.3d 365, 371 (7th Cir. 2015).

The *Alvarado* court also remarked that the Ninth Circuit, along with the DOL, "have woodenly ported the definition from section 213(a)(2) to the commission exemption with no sensitivity to the very different purpose of that exemption. *Id.*; *see, e.g.*, *Geig*, 407 F.3d at 1047–49; *Martin v. The Refrigeration School, Inc.*, 968 F.2d 3, 6–8 (9th Cir. 1992). Nevertheless, *Alvarado* is in direct conflict with Ninth Circuit precedent which this Court is bound to follow. The Court is thus required to turn to DOL regulations that instruct:

> It is clear from the legislative history of the 1961 amendments to the Act that no different meaning was intended by the term "retail or services establishment" from that already established by the Act's definition, wherever used in the new provisions, whether relating to the coverage or to exemption. (See S. Rept. 145, 87th Cong., first session p. 27; H.R. 75, 87th Cong., first session p. 9.) The legislative history of the 1949 amendments and existing judicial pronouncements regarding section 13(a)(2) of the Act, therefore, will offer guidance of the application of this definition.

29 C.F.R. § 779.312; *see also Gieg*, 407 F.3d at 1047 ("When Congress enacted section 207(i) in 1966, it intended the term 'retail or service establishment' to have the same meaning" as § 213(a)(2) before it's repeal).

Alternatively, Defendants argue that if 29 C.F.R. § 779.411 does apply, the DOL had already determined that The Driver Provider met the requirements of the § 7(i) exemption when it investigated the Jackson Hole location. (*See* Doc. 381-1, Ex. A.) Furthermore, Defendants contend that "some of Defendants' clients [being] businesses does not change the outcome because Defendants' business clients do not require the use of specialized facilities or equipment and the services are not different than services provided to the public." (Doc. 381 at 9); *see also* Opinion Letter, FLSA2020-11, 2020 WL 5367068, at *3 (Aug. 31, 2020). Likewise, they argue it is not a "resale" when one of Defendants' business clients uses Defendants' services for the benefits of the clients'

- 6 -

customers. *See Alvarado*, 782 F.3d at 369–70.

Plaintiffs argue Defendants have failed to make a threshold showing that this factor could apply to the Driver Provider. The Court disagrees. For purposes of the Motion for Decertification of FLSA Collective, the Court finds that Defendants' pleadings and cited evidence have met the threshold for alleging The Driver Provider could satisfy this factor— even if Plaintiffs disagree with Defendants' arguments on the merits. The Motion will therefore not be denied on this basis. Plaintiffs also argue this question can be resolved on a collective basis. Defendants do not dispute this. As such, the Court finds this factor does not support decertification, and will analyze whether there is an individualized question under the next two factors.

2. <u>Whether Drivers are being paid more than one and one half times the federal minimum wage.</u>

Typically, "§ 7(i) is in fact a highly individualized defense because its application requires week-by-week and other periodic calculations (*e.g.*, not less than monthly on one part of the formula) specific to each individual Plaintiff and his or her particular circumstances." *Johnson v. TGF Precision Haircutters, Inc.*, No. CIV.A. H-03-3641, 2005 WL 1994286, at *6 (S.D. Tex. Aug. 17, 2005). "The 'regular rate' of pay, for example, 'is a rate per hour, computed for the particular workweek by a mathematical computation in which hours worked are divided into straight time earnings for such hours to obtain the statutory regular rate.'" *Id.* (quoting 29 C.F.R. § 779.419; *Schwind v. EW & Assocs., Inc.*, 371 F. Supp. 2d 560, 567 (S.D.N.Y. 2005)). Additionally, § 7(i) requires totaling each plaintiffs' commissions over a "representative period" not less than one month. *See* 29 U.S.C. § 207(i). The "representative period" is "a period which typifies the total characteristics of an employee's earning pattern in his current employment situation, with respect to the fluctuations of the proportion of his commission earnings to his total compensation." 29 C.F.R. § 779.417. "[T]he exemption under § 207(i) requires a 'highly individualized' inquiry focused on 'week-by-week and other periodic calculations,' such as regular rate of pay, which 'is a rate per hour, computed for the particular workweek by

- 7 -

a mathematical computation in which hours worked are divided into straight time earnings for such hours to obtain the statutory regular rate.'" *Velasquez v. Dig. Page, Inc.*, 303 F.R.D. 435, 442 (E.D.N.Y. 2014) (citations omitted). For example, the *Velasquez* court found that the inquiry

> mandates an individualized review of each particular class member to determine if overtime is due—namely, how many hours did they work in a given week; if they worked more than 40 hours per week; what was their regular rate of pay; did it amount to more than the prevailing minimum wage applicable at that time; did they earn commission, and if so, how much; and, did that amount of commission constitute more than 50% of their compensation for that period.

*Id.*

Defendants argue that applying this exemption differs from cases that apply an exemption based on an employee's primary job responsibilities, such as those applied to executives or administrators. *See* 29 U.S.C. § 213(a)(1). They argue those cases are better suited for certification if a similarity in duties can be established. *See Myers v. Hertz Corp.*, 624 F.3d 537, 549 (2d Cir. 2010).

Under these facts, Defendants assert that the proof required to establish these individualized § 7(i) exemptions would result in mini-trials for approximately 80 individuals for the following reasons: (1) determining compensability of time spent between rides/breaks is an individualized question because Plaintiffs give varying answers as to what they did, or could do, during breaks; (2) The Driver Provider's policy allowed employees to engage in personal activities between rides if they're in the next pickup location within 15 minutes of the scheduled time; (3) some Drivers knew this policy and engaged in personal activities during breaks; and (4) other Drivers claim they were instructed by dispatchers that they could not engage in personal activities during breaks and therefore did not. *See, e.g.*, *Brechler v. Qwest Commc'ns Int'l, Inc.*, No. CV-06-00940-PHX-ROS, 2009 WL 692329, at *2–3 (D. Ariz. Mar. 17, 2009) (decertifying a collective action where the plaintiffs had different working time instructions).

Plaintiffs counter that this factor can be decided on a collective basis because it only requires a review of the number of hours worked and/or the wages paid. Plaintiffs also

argue that the DOL requires Defendants to keep records showing they paid employees in accordance with the § 7(i) exemption. To this point, they assert that because Defendants have failed to keep required records for hours worked, Plaintiffs will establish hours worked and payments received, or not received, through Defendants' records, testimony, and other documents "and on the basis of just and reasonable inferences from representative and expert testimony." (Doc. 443 at 11.)

The Court agrees with Defendants that this factor requires individualized analysis. Plaintiffs do not dispute that the Drivers had different job duties, expectations, and responsibilities regarding break time that makes assessing compensation—or a Driver's decision to engage in unpaid personal activities during breaks—variables that differ on an individual and daily basis. Because some Drivers took breaks and others did not, and because some Drivers were expecting payment on breaks and others were not, it would be infeasible to calculate this factor on a collective basis without conducting approximately 80 mini-trials for each individual Driver's compensation. Plaintiffs cannot circumvent this problem through reasonable inferences and expert testimony for the collective, as there are too many individual variables in the duties, expectations, and time spent on breaks and personal activities that differ for Drivers daily and weekly. *See Brechler*, 2009 WL 692329, at *2–3. This factor is thus infeasible to accomplish on a collective basis. *See Campbell*, 903 F.3d at 1116.

   3. <u>Whether Drivers earned 50% or more of their compensation through commissions.</u>

Defendants next argue that Drivers were paid in various ways such as commissions, hourly, and flat rates that differed based on job duties, experience, and CDL certification. As such, determining whether Drivers earned 50% or more of their compensation through commissions requires an individualized analysis. For example, Defendants cite that many Drivers were paid almost exclusively on a commission basis. (Doc. 381 at 13.) Yet, Defendants cite to various discrepancies in the record: (1) some Drivers deny ever being paid commission and claim to have only been paid hourly; (2) Named-Plaintiff Salazar

1  stated that she was primarily paid a percentage of the amounts charged customers, but then
2  also testified that she was paid hourly and at other times a flat rate; (3) Opt-In Plaintiff
3  Drozdowski testified that Drivers were paid commissions by zone, but then hourly rates
4  for some assignments; (4) Opt-In Plaintiff Howard testified she was understood she'd be
5  paid hourly, but it was later explained she'd be paid on commission; (5) Named-Plaintiff
6  Hanna understood he'd be paid on a commission basis and signed a commission agreement;
7  (6) Named-Plaintiff Lopez understood he would be paid commission; (7) Opt-In Plaintiff
8  Simmons was paid a flat rate for some runs, including "dead head runs" to other states; (8)
9  for Wyoming Drivers, hourly pay included time working at the Stand, errand pay, and
10 "shop hours"; and (9) CDL Drivers were paid a flat rate for over-the-road trips.  (*Id.* at 14.)

11     For these reasons, Defendants argue this factor cannot be determined on a collective basis because the Drivers were paid differently based on their job, location, and assignment.  *See Johnson*, 2005 WL 1994286, *6 (decertifying collective action under this factor because "[t]he proof required to establish these individualized § 7(i) exemption defenses would become the overwhelming focus of a trial which, to a jury or factfinder, would amount to trials of perhaps as many as 200 individual cases.").

17     Plaintiffs counter with the same arguments made for the second factor.  They also appear to argue that Plaintiffs' expert has made determinations that that the amount of compensation represented by commissions can be decided on a collective basis, even with the partial records Defendants produced.  (*See* Doc. 443 at 11 (citing *La Parne v. Monex Deposit Co.*, No. 08-0302, 2009 WL 10669751, at *4 (C.D. Cal Dec. 22, 2009) ("Whether more than half of the [employees'] compensation represents commissions is a factual matter that could be proven on a class-wide basis, as they were all subject to the same pay policy structuring their pay."))).

25     The Court finds that this case is similar to *Johnson* in that determining this factor would require around 80 mini-trials to determine if each Driver qualifies for the § 7(i) exemption.  *See Johnson*, 2005 WL 1994286, at *6.  Unlike *La Parne* where all employees were subject to the same pay policy and structure, that is not the case here.  *See La Parne*,

- 10 -

2009 WL 10669751, at *4. The Court finds Defendants have sufficiently cited to record evidence demonstrating that Drivers' pay structures and pay varied depending on their job duties, location, and assignment. With such a large collective and no uniform pay structure, the Court finds deciding this issue on a collective basis would be infeasible. *See Campbell*, 903 F.3d at 1116.

### B. Taxicab Exemption

Defendants next argue that although the taxicab exemption applies for many Drivers, it must be decided on an individualized basis based on the Driver's vehicle and routes—thus justifying decertification. Under the FLSA, "any driver employed by an employer engaged in the business of operating taxicabs" is exempt from overtime pay. 29 U.S.C. § 213(b)(17). A taxicab is: "(1) a chauffeured passenger vehicle; (2) available for hire by individual members of the general public; (3) that has no fixed schedule, fixed route, or fixed termini." *Munoz-Gonzalez v. D.L.C. Limousine Serv., Inc.*, 904 F.3d 208, 213–14 (2nd Cir. 2018). Other districts have applied this exemption to private chauffeured passenger vehicle companies. *See id.* at 219; *Jihui Zhang v. XYZ Limousine, Inc.*, 2019 WL 1220310 (E.D.N.Y., Mar. 15, 2019); *John v. All Star Limousine Serv., Ltd.*, No. 17-CV-6327 (PKC) (RLM), 2022 WL 36219, at *4 (E.D.N.Y. Jan. 4, 2022).

Defendants argue The Driver Provider meets the requirements to qualify as an employer engaged in the business of operating taxicabs. Reason being, Plaintiffs worked as chauffeurs who operated passenger vehicles, and its services are available for hire by individual members of the public. Defendants also argue many Drivers qualify for the exemption because they had no fixed route, schedule, or fixed termini. On the other hand, they argue some Drivers, like Opt-In Plaintiff Howard, primarily drove shuttles that operated fixed routes, and Opt-In Plaintiff Drozdowski testified that for a period he primarily drove a shuttle with a fixed route between Jackson Hole and Salt Lake City. Fixed routes do not qualify under the taxicab exemption, which some Drivers drove, and Drivers cannot spend over 20% of their workweek operating vehicles not considered taxicabs. *See Munoz-Gonzalez*, 904 F.3d at 216. As such, Defendants argue an

individualized inquiry into the Drivers' routes is necessary.

Plaintiffs counter that the exemption turns on the nature of The Driver Providers' business, not the individual inquiries of its Drivers. *See Blan v. Classic Limousine Transp., LLC*, No. 19-807, 2021 WL 1176063, at *1, 5–7 (discussing the exemption's required factors and finding "that Classic, on the whole, is not in the business of operating taxicabs," and distinguishing features of defendant's business to that of the taxicab business); *see also Herman v. Brewah Cab, Inc.*, 992 F. Supp. 1054, 1060 (E.D. Wis. 1998) ("The nature of the defendants' business, the working conditions of the drivers and the licensing scheme under which the defendants operate all weigh against a finding that the defendants' business is that of a taxicab company under § 213(b)(17).").

Furthermore, Plaintiffs argue Defendants fail to cite a case that the taxicab exemption requires an individualized analysis. In fact, they argue that *Munoz-Gonzalez*—relied upon by Defendants—turned on the nature of the defendant's business which included: the proportion of business derived from recurrent contracts; the types of trips performed; the types of vehicles in the fleet; whether the services were available to the general public; and whether they covered fixed routes, schedules, and termini. 904 F.3d at 216–19. But even if there were some individualized inquiries necessary, Plaintiffs argue it falls under the "individualized application of defenses" permitted under *Campbell*. 903 F.3d at 1116.

Finally, Plaintiffs emphasize that Defendants did not identify "their numerous contracts for recurrent transportation which make up a substantial portion of their revenue, nor have they identified the numerous fixed routes they serve, including, for instance, running a fleet of 35 'transit' buses (read: city buses) at a construction site at the Intel campus in Chandler." (Doc. 443 at 17.) Defendants dispute this by arguing in *Munoz-Gonzalez*, the court stated in *dicta* that "a company that received virtually all its business from recurrent contracts and corporate clients might not be 'available for hire by individual members of the general public.'" 904 F.3d at 217. However, "so long as a ground transportation company is available for hire by the general public, contracts for recurrent

transportation do not render the taxicab exemption inapplicable." *XYZ Limousine, Inc.*, 2019 WL 1220310, at *7; *see also John*, 2022 WL 36219 at *4 (finding taxicab exemption applied despite almost half of employer's business coming form one recurrent contract). Defendants argue that The Driver Provider's vehicles are available for hire by individual members of the general public, and that since December 2016 less than 25% of its business has been performed under recurrent contracts. (Doc. 451 at 5.)

The Court finds that Defendants have alleged a *prima facie* case that some of its business could be found to operate under the requirements of the taxicab exemption. The Court therefore turns to whether this question can be answered on a collective basis.

To start, under 29 U.S.C. § 213(b)(17) there is no requirement that an employer exclusively operate taxicabs to qualify for the exemption. Rather, for it to apply, Drivers cannot spend over 20% of their workweek operating vehicles not considered taxicabs. *See Munoz-Gonzalez*, 904 F.3d at 216; 29 C.F.R. § 786.200. Defendants argue that most but not all Drivers fall under the exemption. They concede that some Opt-In Plaintiffs primarily operated fixed shuttle routes and are likely not subject to the exemption. And for Drivers who did have shuttle routes, they argue an individualized analysis would be required to determine if they spent over 20% of their time driving those routes. Furthermore, for Drivers who operated sedans and SUVS without a fixed route—like named Plaintiffs—Defendants argue they are more likely to fall within the taxicab exemption compared to those who operated vehicles with over eight passengers and/or drove fixed routes.

Defendants have failed to cite any law stating an individualized assessment of each employee was required to determine the taxicab exemption's applicability. Rather, the law requires the Court to determine whether, overall, whether The Driver Provider "is engaged in the business of operating a taxicab service." 29 U.S.C. § 213(b)(17). Although the statute does not define this standard, our District has considered various DOL fact-intensive factors to evaluate a business, including, but not limited to:

> (1) whether the company is in the business of providing transportation to the general public; (2) whether the company drives passengers to requested

> points; (3) whether the company operates on fixed or non-fixed routes (with the assumption that taxicabs do not operate on fixed routes); (4) whether the company provides on-demand transportation or pre-scheduled service; (5) whether the company uses a variety of vehicles to transport passengers; (6) whether the company relies on radio dispatch; (7) whether the company uses a taximeter or similar method for charging fees based on mileage; (8) whether drivers service their vehicle with gas, oil, and water as needed; and (9) whether drivers may receive tips from passengers.

*Chao v. Am. Serv. Sys., Inc.*, No. 980174, 2001 WL 37131280, *at 4 (D. Ariz. Oct. 9, 2001).

Nevertheless, as Defendants' Reply states, "[d]etermining whether the taxicab exemption applies to Opt-In Plaintiffs would require various mini-trials to determine whether Drivers spent at least 80% of their time operating sedans and SUVs on non-fixed routes." (Doc. 451 at 8.) The Court agrees. It also agrees with Plaintiffs that the law requires evaluating the nature of The Driver Provider as a whole. Yet, as discussed above, because The Driver Provider employs Drivers with varying job duties, provides at least some contracted services, has Drivers completing both fixed and non-fixed routes while driving different vehicles for different purposes, and employs Drivers for various different services, the Court will be required to conduct a vast amount of mini-trials with individual Plaintiffs to properly evaluate the business as a whole. *See, e.g.*, *Deane v. Fastenal Co.*, No. 11-CV-0042 YGR, 2013 WL 675462, at *3 (N.D. Cal. Feb. 25, 2013) (decertifying collective action where hundreds of mini-trials would be required to resolve misclassification claims).

Due to the complexity of The Driver Provider's business operations, the Court finds it would be infeasible to address the taxicab exemption on a collective basis. *See Campbell*, 903 F.3d at 1116.

## IV.   CONCLUSION

Accordingly,

…

…

…

- 14 -

**IT IS ORDERED** granting Defendants' Motion for Decertification of FLSA Collective. (Doc. 381.)

Dated this 30th day of August, 2023.

_____
Honorable Susan M. Brnovich
United States District Judge