**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Kelli Salazar, et al., | No. CV-19-05760-PHX-SMB |
| Plaintiffs, | **ORDER** |
| v. | |
| Driver Provider Phoenix LLC, et al., | |
| Defendants. | |

Pending before the Court are cross-motions for summary judgment. Plaintiffs filed a Motion for Partial Summary Judgment (Doc. 497) along with the required Statement of Facts (Doc. 498). Defendants filed a response (Doc. 529) and their own Statement of Facts (Doc. 530). Plaintiffs replied (Doc. 550). Defendants also filed a Motion for Summary Judgment (Doc. 506), to which Plaintiffs responded (Doc. 533) and Defendants replied (Doc. 549). The Court held oral argument on October 25, 2023. After reviewing the parties' arguments and the relevant law, the Court will grant summary judgment in part and deny it in part for the reasons set forth below.

## I.    BACKGROUND

The Court and parties are familiar with the factual and procedural background of this case, and therefore the Court will only briefly recount it here. Defendants provide chauffeured transportation services in Arizona, Utah, and Wyoming and operate a fleet of buses, vans, sport utility vehicles ("SUVs"), sedans, and other various vehicles. (Doc. 1 at 2.) The Named Plaintiffs primarily operate SUV's and sedans in the Phoenix, Arizona

1   area.  (Doc. 506 at 2.)  The Driver Provider ("DP") classifies their employees as exempt

2   from the Fair Labor Standards Act's ("FLSA's) overtime requirements.  (*Id.* at 3.)

3   Plaintiffs claim that this classification is mistaken, and therefore allege that DP has failed

4   to pay overtime and straight time wages in violation of the FLSA, the Arizona Wage Act

5   ("AWA"), and the Arizona Minimum Wage Act ("AMWA").  (Doc. 413 at 26–29.)  Both

6   parties now move for summary judgment on these claims and related issues.  (*See* Docs.

7   497 and 506.)

8   **II.     LEGAL STANDARD**

9            Summary judgment is appropriate in circumstances where "there is no genuine

10  dispute as to any material fact and the movant is entitled to judgment as a matter of law."

11  Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of a case under

12  the applicable substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

13  Factual disputes are genuine when the evidence could allow a reasonable jury to find in

14  favor of the nonmoving party.  *Id.*  "A party asserting that a fact cannot be or is genuinely

15  disputed must support the assertion by . . . citing to particular parts of materials in the

16  record" or by "showing that an adverse party cannot produce admissible evidence to

17  support the fact."  Fed. R. Civ. P. 56(c)(1)(A)–(B).  Additionally, the Court may enter

18  summary judgment "against a party who fails to make a showing sufficient to establish the

19  existence of an element essential to that party's case, and on which that party will bear the

20  burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

21           When considering a motion for summary judgment, a court must view the evidence

22  in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith

23  Radio Corp.*, 475 U.S. 574, 587 (1986).  The Court must draw all reasonable inferences in

24  the nonmovant's favor.  *Anderson*, 477 U.S. at 255.  Additionally, the Court does not make

25  credibility determinations or weigh the evidence.  *Anderson*, 477 U.S. at 253.  The

26  determination of whether a given factual dispute requires submission to a jury is guided by

27  the substantive evidentiary standards that apply to the case.  *Id.* at 255.

28           The burden initially falls with the movant to demonstrate the basis for a motion for

1  summary judgment, and they must identify "those portions of [the record] which it believes

2  demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at

3  323.  If this initial burden is not met, the nonmovant does not need to produce anything.

4  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000).

5  However, if the initial burden is met by the movant, then the nonmovant has a burden to

6  establish that there is a genuine issue of material fact.  *Id.* at 1103.  The nonmovant "must

7  do more than simply show that there is some metaphysical doubt as to the material facts."

8  *Zenith Radio Corp.*, 475 U.S. at 586.  Bare assertions alone do not create a material issue

9  of fact, and "[i]f the evidence is merely colorable, or is not significantly probative,

10  summary judgment may be granted."  *Liberty Lobby*, 477 U.S. at 247–50 (citations

11  omitted).

12  **III.    DISCUSSION**

13       Both parties move for summary judgment on several issues.  (*See* Doc. 497 and

14  506.)  The Court will discuss these issues in turn and address sub-issues as they arise.

15       **A. Local Rule 56.1**

16       As an initial matter, the Court instructed the parties to review *Hunton v. Am. Zurich*

17  *Ins. Co.*, No. 16-00539, 2018 WL 1182552 (D. Ariz. Mar. 7, 2018) before briefing

18  summary judgment.  (Doc. 92 at 4.)  The Court also instructed parties to limit their required

19  statements of facts to twenty pages, exclusive of exhibits.  (Doc. 487.)  In a reply brief,

20  Plaintiffs assert that Defendants statement of facts violates LRCiv 56.1 as interpreted by

21  *Hunton*.  (Doc. 550 at 2.)  Defendants did not provide any counterarguments.

22       LRCiv 56.1 requires both parties to file separate statements of facts when briefing

23  summary judgment.  The moving party is required to set forth each material fact in a

24  separately numbered paragraph that refers to a "specific admissible portion of the record

25  where the fact finds support." LRCiv 56.1(a).  The opposing party must file a controverting

26  statement of facts that (1) responds to each paragraph of the moving party's statement of

27  facts, indicating whether the opposing party disputes the facts set forth, and (2) provides

28  any additional facts that rase a genuine issue of fact or preclude summary judgment. LRCiv

56.1(b).

*Hunton* addresses LRCiv 56.1, noting that the rule "imposes specific requirements on the form and content of summary judgment with the goal of simplifying the process." 2018 WL 1182552, at *2.  Specifically, the *Hunton* court remarked that the rule "requires the controverting party to provide a specific record reference supporting the party's position if a fact is disputed; it does not permit explanation and argument supporting the party's position to be included in the response to the moving party's statement of facts." *Id.* (quoting *Pruett v. Arizona*, 606 F. Supp. 2d 1065, 1075 (D. Ariz. 2009)).  Therefore, Plaintiffs argue that Defendants violated LRCiv 56.1(b) by providing commentary beyond merely admitting or denying factual assertions along with objections in their controverting statement of facts.  (Doc. 550 at 3–4.)  Ultimately, Plaintiffs claim that Defendants' purported violation "deprives Plaintiffs of an even playing field, hinders the efficient resolution of Plaintiffs' motion and are a means for DP to exceed the page limit on argument."  (*Id.* at 4.)  The Court agrees.

The Court retains the discretion to decline to consider anything "additional" in a statement of facts.  *See Hunton*, 2018 WL 1182552, at *3 (noting that the Court *may* disregard everything but the word "admitted" or "disputed" and the corresponding references to the record, along with any improperly disputed facts).  The Court will exercise that discretion here.  Defendants repeatedly included expositional facts and explanation in their statement of facts.  But explanation and argument belong in the responsive motion, not in the statement of facts.  If Defendants believe that information beyond a simple admit or deny is in order, they must admit the assertion and include additional material information in a separately numbered paragraph.  *See* LRCiv 56.1(b); *Hunton*, 2018 WL 1182552 at *3.  Therefore, every explanation or argument supporting Defendants' position inserted after an "admit" or "deny" response will not be considered.  *See Hunton*, 2018 WL 1182552, at *2.  Furthermore, the Court will not consider the "objections" made in Defendants' statement of facts.  The Local Rules require parties to list their objections "summarily without argument."  LRCiv 7.2(m)(2).  Defendants instead incorporated their

1  objections into their contravening statement of facts.  Accordingly, these "objections" will

2  also not be considered.  *See Am. Express Co. v. Ponnambalam*, No. CV-18-03237-PHX-

3  SMM, 2020 WL 13442489, at *4 (D. Ariz. Apr. 7, 2020).

4        The Court does not condone parties placing arguments within a separate statement

5  of facts, and the Court reminds parties to diligently follow the local rules of this District.

6      **B.  Overtime Exemptions**

7        Defendants argue that DP is exempt from the FLSA's overtime requirements

8  because DP meets either the 7(i) exemption or the taxicab exemption.  (*See* Doc. 506.)

9  Plaintiff counters that neither exemption applies.  (*See* Doc. 533.)  Exemptions must be

10  given a fair interpretation, as opposed to a narrow interpretation.  *Encino Motorcars, LLC*

11  *v. Navarro*, 138 S. Ct. 1134, 1142 (2018).  The employer bears the burden of proof to show

12  an exemption applies.  *Clarke v. AMN Servs., LLC*, 987 F.3d 848, 853 (9th Cir. 2021), *cert.*

13  *denied*, 142 S. Ct. 710 (2021).

14         **1.  7(i)**

15  The Court will analyze the 7(i) exemption first.  This exemption states:

16        No employer shall be deemed to have violated [the overtime provisions] by
           employing any employee of a retail or service establishment for a workweek
17        in excess of the applicable workweek specified therein, if (1) the regular rate
           of pay of such employee is in excess of one and one-half times the minimum
18        hourly rate applicable to him under the [minimum wage section] of this title,
           and (2) more than half his compensation for a representative period (not less
19        than one month) represents commissions on goods or services.

20  29 U.S.C. § 207(i).  For the exemption to apply, Defendants must prove that: (1) each

21  business location is a retail or service establishment; (2) each Driver's regular rate of pay

22  was more than 1.5 times the minimum wage; and (3) more than half of each Driver's

23  compensation represented commissions on the sale of goods or services.  *Gieg v. DDR,*

24  *Inc.*, 407 F.3d 1038, 1046 (9th Cir. 2005) (citing 29 U.S.C. § 207(i)).

25        Under the first factor, Defendants argue that DP operates a "retail or service

26  establishment" within the meaning of the 7(i) exemption.  *See* 29 C.F.R. § 779.312; *see*

27  *also Gieg*, 407 F.3d at 1046.  The parties disagree on how the Court should analyze if DP

28  qualifies as a "retail or service establishment."  Defendants argue that the Court should

follow the Seventh Circuit and interpret the statute according to its plain and ordinary meaning.  Plaintiffs argue that the Court must apply the definition in 29 C.F.R. § 779.312.

Defendants argue the Department of Labors' ("DOL") definition of "retail or service establishment" is invalid because it derives its definition from 29 U.S.C. § 213(a)(2), which was repealed.  (Doc. 506 at 13.)  Defendants point to the Seventh Circuit's critique of the DOL regulations' definitions in relation to the FLSA:

> [The DOL regulations] attempt to define a 'retail or service establishment' by listing factors of dubious relevance, such as that '75 per centum of [its] annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry,' 29 C.F.R. § 779.312, or that the establishment 'serves the everyday needs of the community in which it is located.' 29 C.F.R. § 779.318. We don't see the connection between these criteria and the reasons for excusing certain employers from the overtime provisions of the Fair Labor Standards Act . . . . The Department's definition comes from section 213(a)(2), which as we've noted was the intrastate business exemption.

*Alvarado v. Corp. Cleaning Servs., Inc.*, 782 F.3d 365, 371 (7th Cir. 2015).

The *Alvarado* court also remarked that the Ninth Circuit, along with the DOL, "have woodenly ported the definition from section 213(a)(2) to the commission exemption with no sensitivity to the very different purpose of that exemption."  *Id.*  However, *Alvarado* directly conflicts with Ninth Circuit precedent by which this Court is bound.  The Ninth Circuit has recognized that application of the DOL definition for "retail or service establishment" is still appropriate, despite the repeal of 29 U.S.C. § 213(a)(2).  *Gieg*, 407 F.3d at 1047.  Therefore, the Court will analyze the first prong of the 7(i) exemption pursuant to the DOL definition.

Under the DOL regulations, "retail or service establishment" qualifications are as follows: (1) the business must "engage in the making of sales of goods or services"; (2) "75 percent of its sales of goods or services, or of both, must be recognized as retail"; and (3) "not over 25 percent of its sales of goods or services, or of both, may be sales for resale." 29 C.F.R. § 779.313.  Additionally, this exemption "is available only to a 'traditional local retail or service establishment.'"  *Delara v. Diamond Resorts Int'l Mktg., Inc.*, No. 19-00022, 2021 WL 6123563, at *4 (D. Nev. Dec. 27, 2021) (quoting 29 C.F.R. § 779.315).

To meet this definition, an establishment must be part of an industry in which there is a "retail concept" and the business's services must be recognized as retail in the industry. *See id.*; *Idaho Sheet Metal Works, Inc. v. Wirtz*, 383 U.S. 190, 202–03 (1996) ("[I]t is generally helpful to ask first whether the sale of a particular type of goods or services can ever qualify as retail whatever the terms of sale; if and only if the answer is affirmative is it then necessary to determine the terms or circumstances that make a sale of those goods or services a retail sale."); 29 C.F.R. § 779.329 ("If the subject of the sale does not come within the concept of retailable items contemplated by the statute, there can be no recognition in any industry of the sale of the goods or services as retail, for purposes of the Act, even though the nomenclature used by the industry members may put a retail label on the transaction.").  The burden rests on DP to show that its industry has a retail concept.

Defendants argue that if 29 C.F.R. § 779.411 does apply, the DOL already determined that DP met the requirements of the 7(i) exemption when the DOL investigated the Jackson Hole location.  (*See* Doc. 506 at 17.)  Defendants also argue that DP's services are retail in nature because they sell their services to the general public and serve the everyday needs of the community.  (Doc. 533 at 5.)  And lastly, Defendants argue that none of DP's sales are "resales" because their services are furnished to the end users.  (*Id.* at 8.)  Plaintiffs argue Defendants have failed to show—and now do not have the data to show— that DP is a "retail or service establishment" under 7(i).  (Doc. 533 at 2–3.)  Plaintiffs contend that DP cannot make the two-part showing that for each establishment and each year, 75% of DP's services were "recognized as retail sales" and not "sales for resale."  (*Id.* at 3.)  Plaintiff also contends that even if they had the data, DP's services are not retail in nature and therefore DP does not qualify for the exemption.  (Doc. 497 at 13.)

It appears both parties agree that DP sells services, and therefore do not dispute the first prong of the analysis.  However, the parties dispute whether DP can show that 75% of its sales were recognized as retail and not over 25% of its sales were sales for resale.  This dispute, however, cannot be resolved here.   By failing to timely disclose financial information for each establishment, DP precluded itself from being able to establish the

7(i) exemption's revenue requirements.  The Court previously excluded this data (Doc. 570.), so DP cannot show that 75% of each establishment's sales for each of the relevant years are recognized as retail within the industry.  The Court explained how Defendants had every opportunity and sufficient time to produce relevant data on this question to have it brought in as evidence.  (*See id.*)  At this juncture, Defendants' failure to produce any records showing their annual sales revenues for each establishment and for each year precludes their claimed 7(i) exemption because it directly contradicts the applicable regulations.  *See* 29 C.F.R. § 779.342 ("The 'annual dollar volume of sales' of an establishment consists of the gross receipts from all sales of the establishment during a 12-month period."); *Alston v. DIRECTV, Inc.*, 254 F. Supp. 3d 765, 783 (D.S.C. 2017) ("[T]he only evidence to which DirecTV points to prove that it employs Plaintiffs in a retail or service establishment . . . refers to the volume of goods and services sold by DirecTV as a whole and makes no mention of the volume of goods and services sold by any subpart thereof."); *Dahdouh v. Rd. Runner Moving*, No. 20-61936, 2021 WL 3682293, at *5 (S.D. Fla. Aug. 3, 2021), *report and rec. adopted*, No. 20-61936-RAR, 2021 WL 3674692 (S.D. Fla. Aug. 19, 2021) ("Defendants failed to provide evidence of retail/resale percentages in the first instance notwithstanding their burden to do so."); *Lopez v. Triangle Fire, Inc.*, No. 15-22209-CIV-KING, 2017 WL 2272057, at *4 (S.D. Fla. May 23, 2017) ("Defendants have failed to meet their burden of proving the applicability of the exemption because the record does not establish precise percentages of dollar volume attributable to sales which could properly be designated as retail sales.").

Defendants concede they have never analyzed the retail sales requirements for *any* of their establishments.  Rather, they argue that all their sales are retail.  (*See* Doc. 529 at 29.)  They rely solely on the opinion of their counsel, Stacy Gabriel.  (*See id.*)  But the relevant inquiry is whether the sales are recognized as retail *within the industry*, which is not determined by the employer.  *Wirtz*, 383 U.S. at 204-05; 29 C.F.R. § 779.324 ("[T]he basis for the determination as to what is recognized as retail 'in the particular industry' is wider and greater than the views of an employer in a trade or business, or an association of

such employers.  It is clear from the legislative history and judicial pronouncements that it was not the intent of this provision to delegate to employers in any particular industry the power to exempt themselves from the requirements of the Act.").  Defendants have not provided any evidence that their sales would even be recognized as retail within their respective industry.  This failure also proves fatal to Defendants' position.

For these reasons, Defendants cannot and have not shown that DP is a "retail or service establishment."  They do not meet the second prong of 29 C.F.R. § 779.313.  Because the Court finds that DP does not meet the first requirement of the 7(i) exemption, the exemption fails, and the Court will not analyze the other two requirements.  Therefore, the Court will deny Defendants' request for summary judgment as to this exemption.

### 2. The Taxicab Exemption

Defendants next argue that DP is exempt from the FLSA's overtime requirements because Driver Provider meets the taxicab exemption.  (Doc. 506 at 6.)  Under the FLSA, "any driver employed by an employer engaged in the business of operating taxicabs" is exempt from overtime pay.  29 U.S.C. § 213(b)(17).

As a preliminary matter, the parties disagree on whether to analyze this exemption by looking at the job of an individual driver or the business as a whole.  Defendants argue the relevant question is what percentage of time Plaintiffs spend operating vehicles that meet the definition of "taxicab."  (Doc. 529 at 11.)  Plaintiffs argue that the analysis must be made on a company wide basis.  (Doc. 550 at 9–10.)  The statutory text supports Plaintiffs' position because it necessarily requires the Court to determine if the employer is "engaged in the business of operating taxicabs."  29 U.S.C. § 213(b)(17).  The case law also supports this position.  *See Blan v. Classic Limousine Transp., LLC*, No. 19-807, 2021 WL 1176063, at *1, *5–*7 (W.D. Pa. Mar. 29, 2021) (discussing the exemption's required factors and distinguishing features of defendant's business to that of the taxicab business); *see also Herman v. Brewah Cab, Inc.*, 992 F. Supp. 1054, 1060 (E.D. Wis. 1998) ("The nature of the defendants' business, the working conditions of the drivers and the licensing scheme under which the defendants operate all weigh against a finding that the defendants'

business is that of a taxicab company under § 213(b)(17)."). Plaintiffs also correctly point out that the analysis in *Munoz-Gonzalez* turned on the nature of the defendant's business which included: the proportion of business derived from recurrent contracts; the types of trips performed; the types of vehicles in the fleet; whether the services were available to the general public; and whether they covered fixed routes, schedules, and termini. 904 F.3d at 216–19. Therefore, the Court will analyze the exemption on a company wide basis.

To start, the Court must determine what "taxicab" means because the FLSA does not define the term "taxicab." Courts and the DOL have stepped into this void and provided conflicting definitions. As such, the parties dispute which definition the Court should use in analyzing whether DP meets the exemption.

The Defendants urge this Court to adopt the Second Circuit's "taxicab" definition. *See Munoz-Gonzalez v. D.L.C. Limousine Service, Inc.*, 904 F.3d 208, 214–15 (2d Cir. 2018). The *Munoz-Gonzalez* court defined a taxicab as "(1) a chauffeured passenger vehicle; (2) available for hire by individual members of the general public; (3) that has no fixed schedule, fixed route, or fixed termini." *Id.* Since publication of this case, several district courts have applied this exemption to private chauffeured passenger vehicle companies. *See id.* at 219; *Jihui Zhang v. XYZ Limousine, Inc.*, 2019 WL 1220310 (E.D.N.Y., Mar. 15, 2019); *John v. All Star Limousine Serv., Ltd.*, No. 17-CV-6327 (PKC) (RLM), 2022 WL 36219, at *4 (E.D.N.Y. Jan. 4, 2022). On the other hand, Plaintiffs advocate for the Court to use the Department of Labor's Field Operation Handbook's ("FOH") definition. Although the Court will analyze the exception under both definitions, the analysis begins with the *Munoz-Gonzalez* elements as they apply to the business as a whole. First, Plaintiffs provided evidence that that 63% of DP's fleet was made up on larger vehicles that would not qualify as taxi cabs. Specifically, it includes 73 buses, 3 "Textron Tugs" (described as like a Disneyland tram), and 16 sprinter vans. (Doc. 497 at 22.) Defendants counter that the fleet also contains 28 sedans, 33 SUVs, 1 limousine, and 1 limovan. (Doc. 530 at 2–3.) However, this contention appeared in an explanation after an "admitted" statement in Defendants' statement of facts, and therefore will not be

considered.  (*Id.*)  Nevertheless, there is nothing in *Munoz-Gonzalez* to suggest that the exemption only applies if the fleet is made up of small vehicles.  In *All Star Limousine Serv., Ltd.*, the exemption was applied even though the employer had buses in the fleet. 2022 WL 36219, at *4–*5.  Plaintiffs did not provide any case law on this specific issue. Therefore, the Court finds that this DP is in the business of operating chauffeured passenger vehicles.

As to the second factor, Defendants argue that DP's vehicles are available for hire by individual members of the public, and that less than 25% of its business has been performed under recurrent contracts.  (Doc. 506 at 8.)  The relevant inquiry is not whether DP does a certain percentage of its business under recurrent contracts.  Rather, it is whether those contracts *prevent* it from offering its services to the general public.  Discovery has revealed that DP does in fact provide passenger transportation to the general public. Defendants have also shown that DP's recurrent contracts, though a component of DP's business, did not prevent it from offering services to the public.  Notably, any member of the public remains free to book a trip with DP.  This fact preserves eligibility for the exemption.  *See XYZ Limousine, Inc.*, 2019 WL 1220310, at *7 ("[S]o long as a ground transportation company is available for hire by the general public, contracts for recurrent transportation do not render the taxicab exemption inapplicable."); *see also All Star Limousine Serv., Ltd.*, 2022 WL 36219, at *4 (finding taxicab exemption applied despite almost half of employer's business coming from one recurrent contract).  The Court finds that DP's services are available for hire by individual members of the general public.

And third, Defendants argue that the Named Plaintiffs did not operate on any fixed routes or termini.  (Doc. 506 at 10.)  However, this again overlooks the requirement to analyze the business as a whole.  Not only did the Named Plaintiffs operate some fixed routes, but DP as a whole operated many fixed routes for corporate clients.  DP's fixed routes include employee shuttles at corporate campuses and constructions sites, school bus routes, National Park tours, and the interstate Mountain States Express route (between Salt Lake City, Utah and Jackson, Wyoming).  (Doc. 498 at 3.)  Therefore, Defendants fail to

meet the third element, and overall fail to meet the requirements of *Munoz-Gonzalez*.

Next, the Court will turn its analysis to Plaintiffs' suggested standards. The current version of the DOL FOH defines a taxicab business as follows:

> The taxicab business consists normally of common carrier transportation in small motor vehicles of persons and such property as they may carry with them to any requested destination in the community. The business operates without fixed routes or contracts for recurrent transportation. It serves the miscellaneous and predominantly local transportation needs of the community. It may include such occasional and unscheduled trips to or from transportation terminals as the individual passengers may request, and may include stands at the transportation terminals as well as at other places where numerous demands for taxicab transportation may be expected.

U.S. Dep't of Labor, Wage & Hour Div. Field Operations Handbook Ch. 24h01 (2023). Just like *Munoz-Gonzalez*, the FOH also requires that taxicab businesses operate chauffeured passenger vehicles with no fixed schedule, route, or termini. *Id*; *see also* U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter Fair Labor Standards Act (Apr. 17, 1998), 1998 WL 852774, at *1 ("The ordinary meaning of that term contemplates vehicles that are offered for hire to the general public on city streets. While it is not necessary that all the transportation be provided to persons who 'flag down' the vehicles, that is an important aspect of the common meaning of 'taxicab.'").

Yet the analysis must go beyond the language of the FOH. Under 29 U.S.C. § 213(b)(17), there is no requirement that an employer exclusively operate taxicabs to qualify for the exemption. Rather, the analysis relies on a fact-intensive evaluation of all relevant facts and circumstances to determine whether a business "is engaged in the business of operating a taxicab service." 29 U.S.C. § 213(b)(17). Again, the statute does not define this standard. The District of Arizona has considered various DOL fact-intensive factors to evaluate a business, including, but not limited to:

> (1) whether the company is in the business of providing transportation to the general public; (2) whether the company drives passengers to requested points; (3) whether the company operates on fixed or non-fixed routes (with the assumption that taxicabs do not operate on fixed routes); (4) whether the company provides on-demand transportation or pre-scheduled service; (5) whether the company uses a variety of vehicles to transport passengers; (6) whether the company relies on radio dispatch; (7) whether the company uses

a taximeter or similar method for charging fees based on mileage; (8) whether drivers service their vehicle with gas, oil, and water as needed; and (9) whether drivers may receive tips from passengers.

*Chao v. Am. Serv. Sys., Inc.*, CIV 98-0174 PHX SMM (JWS), 2001 WL 37131280, at *4 (D. Ariz. Oct. 9, 2001).

Under these factors, DP does not qualify for the taxicab exemption. The Court will address each factor. First, as previously mentioned, the company remains completely open to providing transportation to the general public. Nothing in their business model, including their recurrent contracts, denies them the ability to serve the public at large. Any passenger can book transportation through DP. Second, DP does drive passengers to requested points. This is a cornerstone of DP's business. Third, the company operates on both fixed and non-fixed routes. For the exemption to apply, Drivers cannot spend more than 20% of their time driving fixed routes. 29 CFR § 786.200; *see also* U.S. Dep't of Labor, Wage & Hour Div. Field Operations Handbook Ch. 24h01 (2023). The Named Plaintiffs, as shown through the evidence, meet this standard. (Doc. 506 at 7.) However, Defendants conceded at oral argument that many Drivers operate primarily on fixed routes. In fact, much of DP's business comes from recurrent contracts with fixed routes.

Fourth, Drivers are not permitted to "cruise" for passengers or pick up passengers that hail them from the street. Taking this into consideration, and the factor's assumption that taxicabs do not operate on fixed routes, this factor cuts against application of the exemption. Moreover, this factor goes hand in hand with the fifth factor regarding vehicle types. DP uses a wide variety of vehicles to conduct their business. These vehicles range from sedans and SUVs to large passenger vans and buses. The DOL FOH definition specifies the use of small motor vehicles, and 67% of DP's fleet would not satisfy that definition. While DOL regulations allow some time to be performed in nonexempt work (i.e., in driving larger vehicles), the record supports the DP conducts most of its business with larger vehicles. *See* 29 C.F.R. § 786.200 (Drivers cannot spend over twenty percent of their workweek operating vehicles not considered taxicabs.) The Named Plaintiffs, individually, who primarily operated sedans and SUVs, may qualify. But this distinction

ignores the many Drivers who primarily operate mini buses, coach buses, and similar large vehicles that are not "taxicabs." Looking at the business as a whole, this factor cuts against application of the exemption. Sixth, DP does use a dispatch system in which dispatchers assign available rides to Drivers, similar to a traditional taxicab company. As such, this factor likely cuts in favor of the exemption.

Seventh, DP did not use a taximeter, instead relying on newer technology to price and track rides. (Doc. 529 at 14.) In fact, none of DP's vehicles have the traditional markings of a "taxicab" and do not post fares inside of the vehicles. These facts cut against application of the exemption. And eighth, Drivers do not regularly service their assigned vehicles outside of filling them with gas. Most traditional taxicab drivers own and service their own vehicles. *See Am. Serv. Sys., Inc.*, 2001 WL 37131280, at *6. Therefore, this factor cuts against applying the exemption. Lastly, Drivers may receive tips from passengers, much like traditional taxicab drivers. (Doc. 497 at 35.)

Based on these considerations, the Court finds DP is not eligible for the taxicab exemption. Although Defendants may be correct that the Named Plaintiffs may qualify for the exemption, the analysis requires the Court to examine the entire business—not a subset of employees. Taken together, the relevant facts and circumstances lead to the conclusion that DP is not "engaged in the business of operating a taxicab service." 29 U.S.C. § 213(b)(17). However, whether Defendants violated the FLSA by failing to pay overtime remains a disputed question for a jury.

On whether Drivers are exempt from overtime under either of these two exemptions, the Court will grant summary judgment for Plaintiffs.

### C. FLSA Claims

Plaintiffs seek summary partial summary judgment on liability under the FLSA by failing to pay both minimum wages and overtime. (Doc. 497 at 25.) To establish a minimum wage or overtime violation of the FLSA, a plaintiff must establish (1) he was an employee of Defendants, (2) he was covered under the FLSA, and (3) Defendants failed to pay him minimum wage or overtime wages. Leyva v. Avila, 634 F. Supp. 3d 670, 675 (D.

Ariz. 2022); 29 U.S.C. §§ 206(a), 207(a).  Here, each of these requirements are met.  First, it is undisputed that the Plaintiffs, and by extension the Class, are or were employed by DP.  Second, these employees are covered by the minimum wage provisions of the FLSA. See 29 U.S.C. §§ 203(r), (s).   As discussed above, the Court finds there is no exemption to the overtime provision applicable in this case.  Given Defendants' concession in briefing and at oral argument, there is no genuine dispute of material fact on the issue that no overtime was paid and owing to some drivers and the same for minimum wage payment. (See Doc. 530, ¶89 & 91) Accordingly, the Court grants partial summary judgment on Defendants failure to pay minimum wages and overtime under the FLSA for Plaintiffs and will allow Plaintiffs to prove damages at trial.

### D.  Arizona Minimum Wage Act Claims

Plaintiffs also allege that Defendants violated the AMWA by failing to pay required minimum wages and failing to maintain required records.  (Doc. 497 at 27.)  First, Plaintiffs allege it is "undisputed" that Defendants failed to pay minimum wages during certain workweeks.  (*Id.*)  Second, Plaintiffs argue that DP failed to maintain proper records as required under the AMWA and did so willfully.  (*Id.*)   Therefore, Plaintiffs request summary judgment and statutory penalties of $1,000 for every Rule 23 class member under this claim.  Defendants make no counterargument, and in fact admit that "there are some weeks in which some Drivers are owed minimum wage" in their statement of facts.  (Doc. 530 at 11.)

The AMWA requires employers to maintain payroll records "showing the hours worked for each day worked, and the wages and earned paid sick time paid to all employees."   Ariz. Rev. Stat. § 23-364(D).   Failure to do so raises a "rebuttable presumption that the employer did not pay the required minimum wage rate or earned paid sick time."  *Id.*  Further, an employer that fails to pay these wages "shall be required to pay the employee the balance of the wages or earned paid sick time owed, including interest thereon, and an additional amount equal to twice the underpaid wages or earned paid sick time."  § 23-364(G).   A violation of the statute also entitles a prevailing plaintiff to

1  reasonable attorney's fees and costs.  *Id.*

2  Given Defendants' concession in briefing and at oral argument, there is no genuine

3  dispute of material fact on the issue of minimum wage payment.  To that extent, the Court

4  grants summary judgment on this issue for Plaintiffs and will allow Plaintiffs to prove

5  damages at trial.

6  There is also no genuine dispute over recordkeeping.  Plaintiffs contend that

7  Defendants willfully failed to keep proper records.  (Doc. 497 at 33–34.)  Defendants

8  disputed many of Plaintiff's facts regarding record keeping facts but don't provide citations

9  to evidence that actually contradicts the fact as stated by Plaintiffs.   Plus, much of

10  Defendants explanations about a disputed fact are not being considered for violating Local

11  Rule 56.1.  It is clear from the record that Defendants' record keeping software (Santa

12  Cruz)  didn't track all time worked.  It didn't track pre- and post-trip work, which was

13  estimated by Defendants.   Additionally, the Defendants concede that there may be

14  recordkeeping violations but argues that these violations were not willful.  (Doc. 529 at

15  26–27.)  The question of willfulness will be addressed in a later section.  But at this

16  juncture, the Court will grant summary judgment on the AMWA claims related to

17  recordkeeping.  This Order will not address Plaintiffs' contention that each Rule 23 class

18  member is entitled to penalties of at least $1,000 pursuant to § 23-364(F).  This claim was

19  be addressed in a separate Order. (Doc. 590)

20  **E.  Arizona Wage Act Claims**

21  Plaintiffs argue that DP violated the Arizona Wage Act ("AWA") by failing to pay

22  Drivers for their pre- and post-shift work.  (Doc. 497 at 26).  Plaintiffs also argue that the

23  commission plan set forth by DP never discussed pre- and post-shift pay and that Drivers

24  were not aware of the commission plan itself.  (*Id.*)  Defendants counter that Driver

25  Provider never had a policy of paying Drivers in Arizona additional hourly amounts beyond

26  their commissions for pre-trip and/or post-trip duties.  (Doc. 506 at 21).  Therefore,

27  Defendants argue that Plaintiffs never had a "reasonable expectation" to be paid in a

28  manner differing  from  the  compensation  plans  provided  to  employees  or  verbal

representations from the company.  (*Id.* at 23.)

Arizona law requires an employer to pay its employees all wages due.  Ariz. Rev. Stat. § 23-355.  "'Wages' means nondiscretionary compensation due an employee in return for labor or services rendered by an employee for which the employee has a *reasonable expectation* to be paid whether determined by a time, task, piece, commission or other method of calculation."  Ariz. Rev. Stat. § 23-350(7) (emphasis added).  This reasonable expectation requirement can arise from an express contract, an implied contract based on the parties' course of dealing, or an employer's policy or practice.  *Zavaleta v. OTB Acquisition LLC*, No. CV-19-04729-PHX-JAT, 2021 WL 824419, at *5 (D. Ariz. Mar. 4, 2021); *Morgan v. Freightliner of Ariz., LLC*, No. CIV 16-498-TUC-CKJ, 2017 WL 2423491, at *7 (D. Ariz. June 2, 2017).

First, the parties dispute whether DP provided the commission plan to the drivers, which would create a reasonable expectation based on an express agreement.  Plaintiffs argue that DP never disclosed the commission plan to Drivers and that the Drivers never agreed to it as their sole source of payment.  (Doc. 550 at 15.)  Defendants counter that this plan was provided to Drivers as a condition of employment and that it fully outlined Driver compensation.  (Doc. 506 at 23.)

As Plaintiffs previously reflected in a declaration, the compensation structure was disclosed, and DP never made specific promise of compensation for duties in addition to the commissions.  (*See* Doc. 38-2 at 7–8).  More specifically, Plaintiffs state that this plan never promised additional compensation for the pre-trip and post-trip duties.  (Doc. 497 at 26.)  Defendants admit this, clarifying that it was never their intent to pay for those duties in addition to the commissions.  (Doc. 506 at 24.)  The provided plan also extended to certain hourly or flat rate compensation, and therefore accounts for the hourly pay at "the Stand."  (*Id.* at 25.)  The terms of this express agreement do not provide Drivers with a reasonable expectation that they would be paid anything beyond the rates listed in the plan. However, Plaintiffs still submit that many Drivers were not given copies of the commission plan.  (Doc. 550 at 15.)  This discrepancy creates a dispute of material fact that precludes

1  summary judgment.  Accordingly, the Court must turn to evidence of an implied agreement

2  or company practice.

3      Plaintiffs allege that DP advertised and told Drivers that they would be paid an

4  hourly wage, thereby giving them the impression that their pre-trip and post-trip work

5  would be compensated.  (*Id.*)  Defendants counter that DP made several verbal

6  representations about the commission policy and that the Drivers understood they would

7  not be paid for that time.  (Doc. 506 at 25.)  As evidence, Defendants point to Plaintiffs'

8  statement of facts, in which Plaintiffs recount an incident where a Driver was shown that

9  he was making $18 per hour, not counting his pre- and post-trip work.  (Doc. 498 at 13.)

10  Additionally, the pay stubs provided by DP to Drivers do not provide clarity on the actual

11  pay practices of DP.  Given the evidence and the lack of clarity regarding DP's pay

12  practices, Drivers may have had a "reasonable expectation" to be paid for their pre- and

13  post-shift work.  Accordingly, a genuine dispute of material fact remains and summary

14  judgment is not warranted on this basis either.

15      The AWA also provides treble damages if an employer "fails to pay wages."  § 23-

16  355(A).  However, an employer does not trigger these damages when "[t]here is a

17  reasonable good faith dispute as to the amount of wages due."  Ariz. Rev. Stat. § 23-352(3).

18  Here, the parties dispute the representation and clarity of DP's pay policies.  They also

19  dispute whether Drivers had a "reasonable expectation" to be paid for their pre- and post-

20  trip work.  These remain open questions that turn on material facts.  Accordingly, this meets

21  the standard of a good faith dispute.  *See Olson v. McKesson Corp.*, No. CV-04-2428-PHX-

22  FJM, 2006 WL 2355393, at *3 (D. Ariz. Aug. 14, 2006) (holding that a dispute over a

23  commission plan is a good faith dispute); *Schade v. Diethrich*, 760 P.2d 1050, 1062 (Ariz.

24  1988) (holding no good faith dispute present when quality of employee's performance and

25  amount of benefits due were already established by a separate committee).  Therefore, the

26  Court will find that this is a good faith dispute.  Due to this finding, Plaintiffs cannot

27  recover treble damages.  Accordingly, the Court will deny summary judgment on the AWA

28

1    claims and will also deny Plaintiffs' claim for treble damages regarding the same.[1]

2         **F.  Willfulness and Liquidated Damages**

3         Plaintiffs also contend that Defendants' alleged FLSA violations were willful.  To

4    establish a willful violation, Plaintiffs' must prove that Defendants "knew or showed

5    reckless disregard for the matter of whether its conduct was prohibited by the statute."

6    *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988); *see also Alvarez v. IBP, Inc.*,

7    339 F.3d 894, 909 (9th Cir. 2003), *aff'd* 546 U.S. 21 (2005).  Negligence alone does not

8    satisfy this standard.  *McLaughlin*, 486 U.S. at 134–35.  Similarly, a "good-faith but

9    incorrect assumption" that conduct was lawful does not rise to the level of willfulness.  *Id.*

10   at 135.  "Reckless disregard includes 'failure to make adequate inquiry into whether

11   conduct is in compliance' with the FLSA . . . and an employer thus acts willfully by

12   'disregard[ing] the very 'possibility' that it was violating the statute.'"  *Terrazas v. Carla*

13   *Vista Sober Living LLC*, No. CV-19-04340-PHX-GMS, 2021 WL 4149725, at *3 (D. Ariz.

14   Sept. 13, 2021) (quoting *Alvarez*, 339 F.3d at 908–09).

15        Additionally, courts may not presume that conduct was willful in the absence of any

16   evidence.  *Alvarez*, 339 F.3d at 909.  Whether a violation is willful is a question of fact that

17   can be submitted to a jury, provided there remains a genuine issue of material fact.

18   *Terrazas*, 2021 WL 4149725, at *5.  If an employer's conduct is considered a "willful

19   violation" the standard two-year statute of limitations is extended to a three-year period.

20   29 U.S.C. § 255(a); *see also McLaughlin*, 486 U.S. at 135.

21        Plaintiffs also request the Court to grant summary judgment finding no good faith

22   defense to liquidated damages.  (Doc. 497 at 38.)  Under the FLSA, liquidated damages

23   are the typical measure of damages unless the employer shows that "it acted in subjective

24   'good faith' and had objectively 'reasonable grounds' for believing that its conduct did not

25   violate the FLSA."  *Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908, 920 (9th Cir. 2003)

26   (quoting 29 U.S.C. § 260).  The employer bears the burden of establishing "subjective and

27

28   _____
     [1] Due to the strange course this case has followed, the AWA claims have not yet been
     certified so his ruling is applicable only to the named Plaintiffs unless and until the AWA
     claims are certified.

objective good faith in its violation of the FLSA." *Loc. 246 Util. Workers Union of Am. v. S. Cal. Edison Co.*, 83 F.3d 292, 297 (9th Cir. 1996).  If they cannot meet this burden, liquidated damages are mandatory.  *Id.*

Defendants rely on the 2012 DOL investigation, in which the DOL determined that DP was properly classifying Drivers as exempt under the 7(i) exemption at the Jackson Hole location.  (Doc. 506 at 30.)  Defendants also contend that they made substantial good faith efforts to comply with the FLSA's requirements, including hiring outside counsel and relying on their advice.  (*Id.*)  Plaintiffs argue that the 2012 DOL investigation does not absolve Defendants' willfulness because the exemption is establishment specific and only relates to the Jackson Hole location.  (Doc. 497 at 33–34.)  Plaintiffs further argue that Defendants failed to disclose all relevant facts to their counsel and then failed to follow their counsel's advice.  (*Id.* at 35–36.)  Therefore, Plaintiffs contend that Defendants cannot rely on either the 2012 DOL investigation nor their counsel's advice in defending their willfulness.  (*Id.*)  Defendants counter that there is no evidence that they had actual knowledge that their conduct violated the FLSA.  (Doc. 506 at 28.)

Here, there remain genuine issues of material fact that preclude summary judgment. The factual disputes preclude a finding of reckless disregard or good faith reliance at this stage.  Particularly, there remains an open dispute as to whether Defendants' actions constituted reckless disregard of their obligations under the FLSA.  A jury is fit to examine the evidence and decide whether DP's conduct constituted a willful violation or good faith reliance in this context.  *Terrazas*, 2021 WL 4149725, at *5.  Accordingly, the Court will deny summary judgment for both parties on the issue of willfulness of any potential FLSA violations.  For the same reasons, the Court will deny summary judgment on the issue of liquidated damages.

Additionally, there remains a genuine dispute of material fact over whether DP's alleged AMWA violations were willful.  Plaintiffs allege that that Defendants failed to follow their counsel's advice, and the advice they allegedly failed to follow goes to hour tracking.  This allegation is a component of the AMWA claims.  Defendants admit that

their counsel advised tracking Drivers' hours worked.  (Doc. 530 at 17.)  However, Defendants also argue that they primarily tracked hours that Drivers spent driving, and that even failing to track employee hours does not negate application of the 7(i) exemption. (Doc. 506 at 30.)  Taken together, there remains a disputed question of material fact on this issue.  The Court will not grant summary judgment on Defendants' willfulness as it pertains to the alleged AMWA claims.

As a final note, in a previous Order, this Court struck Defendants' Section 259 defense.  (Doc. 569 at 7–8.)  Accordingly, the Court will not consider this defense here. (*See* Doc. 506 at 17.)

### G. Other Defendants

Plaintiffs also seek summary judgment regarding individual, personal liability for defendants Jason Kaplan, Kendra Kaplan, and Barry Gross under the FLSA, AWA, and AMWA.  (Doc. 497 at 29.)  Plaintiffs contend that these three individuals were Drivers' "employers" and are therefore liable under these statutes.

The FLSA and the AMWA define "employer" to include "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d); Ariz. Rev. Stat. § 23-362(B); *Loserth v. Accelerated Retention Inst. LLC*, No. CV-18-03587-PHX-SRB, 2020 WL 13268122, at *4 (D. Ariz. Feb. 7, 2020).  This definition "is not limited by the common law concept of 'employer,' but 'is to be given an expansive interpretation in order to effectuate the FLSA's broad remedial purposes.'"  *Boucher v. Shaw*, 572 F.3d 1087, 1090 (9th Cir. 2009) (quoting *Lambert v. Ackerley*, 180 F.3d 997, 1011–12 (9th Cir. 1999)).

Under the AWA, an "employer" as "any individual, partnership, association, joint stock company, trust or corporation, the administrator or executor of the estate of a deceased individual or the receiver, trustee or successor of any of such persons employing any person." Ariz. Rev. Stat. § 23-350(3).  This statutory definition does not authorize individual liability against the owners, officers, and directors of a corporate employer in a case where the claim is for the employer's wholesale failure to pay wages.  *Channel v.*

*Home Mortg., Inc.*, 2005 WL 8160525, at *5, *14 (D. Ariz. Aug. 21, 2005).

As stated, the term is more broadly defined for purposes of an FLSA or AMWA claim, and includes "any corporation, proprietorship, partnership, joint venture, limited liability company, trust, association, political subdivision of the state, [and] *individual or other entity acting directly or indirectly in the interest of an employer in relation to an employee*." Ariz. Rev. Stat. § 23-362(B) (emphasis added). Therefore, under both the FLSA and AMWA, corporate managers can be "individually liable for unpaid wages." *Boucher*, 572 F.3d at 1090–94. However, Plaintiffs must show that these individual managers had and exercised "control over the nature and structure of the employment relationship" or "economic control" over the relationship to be subject to liability. *Lambert*, 180 F.3d at 1011–12 (9th Cir. 1999). In the Ninth Circuit, courts consider whether the alleged employer "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records" in making this determination. *Gilbreath v. Cutter Biological, Inc.*, 931 F.2d 1320, 1324 (9th Cir. 1991). These factors are guidelines meant to approximate the "economic reality" of the relationship between the worker and the alleged employer. *Boucher*, 572 F.3d at 1091; *see also Dawson v. Nat'l Collegiate Athletic Ass'n*, 932 F.3d 905, 909 (9th Cir. 2019).

Under these principles, Plaintiffs' claim for individual liability under the AWA fails. No amount of managerial responsibility or substantial control can overcome the statutory definition. Therefore, summary judgment for individual liability for the AWA claim is denied.

However, there remains a question on liability under the FLSA and the AMWA. Plaintiffs contend that Kendra Kaplan, Jason Kaplan, and Barry Gross maintained operational control of DP and its employment relationships. (Doc. 550 at 18.) Specifically, Plaintiffs assert that the Kaplans "were the only ones with ownership interests and authority to determine the compensation structure and rates and authority to pay or not pay for all hours worked." (*Id.*) As to Mr. Gross, Plaintiffs contend that he had authority regarding

compensation and was involved in hiring and firing drivers and docking their pay. (*Id.* at 19.) Defendants counter that while these three individuals had significant responsibilities over DP, they did not exercise operational control over the day-to-day operations at all relevant times. (Doc. 529 at 25.) Defendants also note that there remains a fact question regarding the times during which each of the individuals might be liable. (Doc. 529 at 26.) The Court agrees.

The actions of these three individuals satisfy the *Bonnette* elements. It is undisputed that at certain times, each of these individuals exercised economic control over the employment relationships between the Drivers and DP. Each had significant control over the hiring and firing of employees, supervised work schedules, determined payment, and kept employment records. Each individual's occasional exercise of this control is sufficient to retain liability. *See Collinge v. IntelliQuick Delivery, Inc.*, 2:12-cv-00824 JWS, 2018 WL 1088811, at *16 (D. Ariz. Jan. 9, 2018). However, each of these individuals were not involved with DP for certain time periods, and therefore could not have exercised the requisite control during these times. In fact, the parties agree that Mr. Gross is not liable for periods where he was not at DP. (*See* Doc. 550 at 9.) Although Jason Kaplan and Kendra Kaplan never left DP, there remains a factual dispute as to the time periods in which they were *actively* involved in DP's operations. (*See* Doc. 529 at 25–26.) Therefore, because there is an open question of *when* each individual might be liable under the FLSA and AMWA claims, summary judgment will be denied.

Relatedly, Plaintiff alleges that Kendra Kaplan's declaration is inadmissible. (Doc. 533 at 17.) After the submission of the filings considered here, the Court found that Ms. Kaplan's declaration was proper rebuttal evidence and should be considered. (Doc. 560.) Therefore, this argument will not be considered.

**IV.   CONCLUSION**

For the above reasons,

**IT IS HEREBY ORDERED** granting in part Plaintiffs' Motion for Partial Summary Judgment (Doc. 497). The Court grants summary judgment in Plaintiffs' favor

as to the applicability of the FLSA exemptions, Plaintiffs' AMWA claims as they pertain to DP's failure to pay required minimum wages and recordkeeping violations, and Plaintiffs' FLSA claims for minimum wage and overtime violations.

**IT IS FURTHER ORDERED** granting in part Defendants' Motion for Summary Judgment (Doc. 506).  The Court grants summary judgment in Defendants' favor as to the question of treble damages under the AWA.

**IT IS FURTHER ORDERED** denying in part Plaintiffs' Motion for Partial Summary Judgment (Doc. 497).  The Court denies summary judgment on Plaintiffs' claims that Defendants violated the AWA, that Drivers' time between trips was compensable work time, and that Jason Kaplan, Kendra Kaplan, and Barry Gross are personally liable.

**IT IS FURTHER ORDERED** denying in part Plaintiffs' Motion for Partial Summary Judgment (Doc. 497) and Defendants' Motion for Summary Judgment (Doc. 506).  The Court denies summary judgment on the question of Defendants' willfulness as it pertains to the FLSA and AMWA claims and on the question of liquidated damages under the FLSA.

Dated this 9th day of November, 2023.

Honorable Susan M. Brnovich
United States District Judge